## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LOWELL L. MOORE,

        Plaintiff,

v.

PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION,

        Defendant.

Case No. 14-2334-DDC

## MEMORANDUM AND ORDER

Plaintiff Lowell L. Moore brings this employment discrimination and retaliatory termination case against defendant Philips Electronics North America Corporation, asserting claims of racial discrimination under 42 U.S.C. § 1981 and retaliatory discharge under Kansas law. This matter is before the Court on defendant's Motion for Summary Judgment (Doc. 36). For the reasons explained below, the Court grants defendant's motion.[1]

### I.    Uncontroverted Facts

The following facts are uncontroverted or, if controverted, are stated in the light most favorable to plaintiff as the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### A.  Plaintiff's Employment

Plaintiff is African-American. He worked for defendant from May 26, 1994, until his termination on June 15, 2013. Plaintiff worked at defendant's facility in Salina, Kansas, which manufactures linear fluorescent lamps. During the period relevant to his lawsuit, plaintiff's job

---

[1]    Plaintiff's Amended Petition (Doc. 20) included a third cause of action alleging that defendant breached an implied employment contract under Kansas law. Defendant's motion also sought summary judgment on this claim and, in response, plaintiff withdrew this claim in his Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 40 at 19). The Court thus treats this aspect of defendant's motion as unopposed and grants summary judgment against this claim as well. *See* D. Kan. Rule 56.1.

title was "Team Attendant II."  Plaintiff's duties included:  (1) operating a forklift to keep lamp and glass production areas supplied; (2) loading and unloading trucks; (3) removing shrinkage; (4) performing production-related jobs at defendant's direction; and (5) performing preventive maintenance and cleaning of production equipment.

During the final six months of his employment, plaintiff's immediate supervisor was Production Supervisor, Richard Jester.  Mr. Jester reported up defendant's corporate hierarchy to Team Leader, Bob Knoth.  In turn, Mr. Knoth reported to Manufacturing Manager, Chris Montgomery, who ultimately reported to Plant Director, Dan Mendicina.

### B.  Defendant's Employee Policies

Defendant's Employee Owners' Manual ("EOM") set out the terms and conditions governing plaintiff's employment.  Among other things, the EOM outlined defendant's disciplinary procedures and described defendant's incident reporting policy.

The EOM contained the terms of defendant's Progressive Disciplinary Action ("PDA") plan.  The PDA plan was a four-step, sequential program used to address employee conduct issues and violations of company policy.  The four steps, from least to most severe, were:  (1) "Written Warning I"; (2) "Written Warning II"; (3) "Final Written Warning, to include suspension when appropriate"; and (4) "Termination."  Doc. 37-2 at 7.  When an employee received a warning at a particular step on the PDA plan, that step would remain in effect for at least one year.  And "each year that an employee [went] without an incident[,] one step of the PDA process [was] removed."  *Id*. at 7.  Generally, defendant adhered to the plan's sequential steps.  But the EOM explicitly permitted defendant to vary from the plan or skip steps, as needed.  Specifically, the EOM provided that defendant:

> reserves the right to administer appropriate disciplinary action for all forms of disruptive and/or inappropriate behavior.  Each situation will be dealt with on an

individual basis, based on the facts and circumstances surrounding the infraction. Depending upon the seriousness of the infraction, not all discipline will follow the steps of the PDA plan.

*Id*. at 7.  Defendant's policy thus did not require it to advance an employee through all four steps of the plan.  Instead, the PDA plan served as a guide and defendant could issue disciplinary warnings or terminate employees at its discretion.

Defendant's incident reporting policy required that all "power vehicle incidents . . . be reported immediately to a supervisor regardless of severity."  *Id*. at 8.  A forklift was a power vehicle under the policy.  The EOM defined an "incident" as "any contact made with an unplanned object, or a near-miss that may have resulted in contact with an unplanned object." *Id*. at 8.  The policy warned employees that a failure "to report such incidents may result in immediate termination per Salina Plant Rules."  *Id*. at 8.  Plaintiff testified that he knew about this reporting policy and understood that failing to report an incident could lead to his termination.

### C.  Plaintiff's Conduct Issues and Policy Violations

#### 1.  Forklift Incident No. 1

On October 24, 2011, plaintiff damaged the floor of defendant's facility while operating a forklift.  He did not report the incident immediately to his supervisor.  Instead, he continued to work, intending to fix the damage himself when he had time.  Before he could do so, plaintiff's supervisor approached him and asked whether he had caused the damage.  Plaintiff admitted he had.  Defendant issued a "Written Warning" to plaintiff for not reporting the incident as required by the incident reporting policy.[2]  This warning reminded plaintiff that the "responsibilities of

---

[2]      In 2011, a "Written Warning" was the equivalent of a "Written Warning II" under defendant's PDA Plan in 2013.  *See* Doc. 40-3 at 29.  After plaintiff received his disciplinary warning in 2011, defendant renamed the first two steps in the PDA plan from "Documented Verbal Warning" and "Written Warning" to "Written Warning I" and "Written Warning II."  S*ee* Doc. 37-2 at 11-13.

operating a forklift in our facility require that we report any [and] all accidents immediately."
Doc. 37-2 at 11.  The warning also stated, "Further occurrences may result in additional
disciplinary action up to and including termination."  *Id*.  Plaintiff, his supervisor, and a Human
Resources representative signed the warning.

### 2.  Confrontation with a Co-Worker

On April 8, 2013, plaintiff and Greg Sonneberger, a Caucasian co-worker, got into an
argument near Line 7 of defendant's facility.  Mr. Jester, plaintiff's supervisor, did not see the
confrontation.  Lana Stanley, an Attendant at defendant's facility, reported the exchange to Mr.
Jester while it was happening.  Mr. Jester testified that Ms. Stanley appeared distraught, nervous,
and scared when she made this report.  After speaking with Ms. Stanley, Mr. Jester went directly
to Line 7.  When he arrived, he found plaintiff and Mr. Sonneberger in an "excited" state.
Because plaintiff's shift was over, Mr. Jester instructed him to go home and calm down.  He told
Mr. Sonneberger, whose shift was just beginning, to calm down and return to work.

After the confrontation, Mr. Jester conducted an investigation.  He spoke with plaintiff,
Mr. Sonneberger, and Ms. Stanley about what had happened.  Mr. Jester also discussed the
results of his investigation with Mr. Knoth, his supervisor, and defendant's Human Resources
Manager, Bryan Herwig.  Following Mr. Jester's report, Mr. Knoth and Mr. Herwig told him to
issue plaintiff a Written Warning II.  Mr. Sonneberger did not receive a warning for his role in
the confrontation.  Instead, Mr. Herwig "orally counseled" him, reminded him of defendant's
expectations, and asked him to apologize to plaintiff.  Neither party has presented evidence about
Mr. Sonneberger's disciplinary record or his conduct during the confrontation.

On April 15, 2013, Mr. Jester gave plaintiff a Written Warning II.  The warning
described the argument as follows:

Lowell [Moore] got into a heated confrontation with Greg Sonneberger at shift change on Monday night.  Lowell raised his voice and was speaking in a loud and threatening manner which was reported as "very disturbing and scary" by other employees in the area.  The content of their discussion was over material placement issues which could have been handled through the mastergroup or the supervisors and not in a confrontation on the back end of the line.  Lowell has since apologized to Greg for the way in which he handled the situation.

Doc. 37-2 at 13.  The warning went on to caution plaintiff that defendant did not tolerate aggressive behavior in the workplace and that "further occurrences may result in additional disciplinary action up to and including termination."  Doc. 37-2 at 13.  At his deposition, Mr. Jester could not recall whether plaintiff had received a disciplinary warning during the 12 months before the argument.  Nor could he remember why Mr. Knoth and Mr. Herwig directed him to issue a Written Warning II rather than a Written Warning I.

### 3.   The Shrinkage Bin Incident

Eleven days later, on April 26, 2013, plaintiff reported a "near miss" incident to Mr. Herwig.  The exact date of the incident is uncertain, but the parties agree that it likely occurred "in or about March 2013."  According to plaintiff, he was cleaning a shrinkage bin (a receptacle where defective lightbulbs are placed) when Diana Swaim, a Caucasian co-worker, approached the bin with a forklift, picked it up, and drove away.  The forklift did not touch plaintiff or cause damage to defendant's property.  But plaintiff testified that the forks on Ms. Swaim's vehicle missed his legs by just three inches.  Darwin Belvill was working near the bin and witnessed the incident.

After plaintiff's report, Mr. Herwig spoke with Ms. Swaim, Mr. Belvill, and Mr. Jester.  Mr. Herwig learned that plaintiff had not reported the incident to Mr. Jester, and, as a result, Mr. Jester had not submitted an incident report to defendant's safety manager.  On May 15, 2013,

Mr. Herwig created a "Memo to File" memorializing the results of his investigation.  This memo, in relevant part, stated:

> On April 26, 2013[,] Lowell Moore was sharing some of his issues he was having working with Diana Swaim.  When asked to share some specific incidents, [one] incident that was most concerning was an alleged [forklift] incident involving Diana that he stated occurred earlier in the month.  Lowell stated that he was working on Line 5 cleaning a shrinkage bin when Diana came in with a [forklift] and picked up the shrinkage bin Lowell was cleaning and almost struck Lowell.  Lowell mentioned Darwin Belvill witnessed the [forklift] incident.  The information I received from Diana was that she recalled an incident where Lowell was trying to clean a shrinkage bin while she was trying to move the shrinkage bin so it could be dumped . . . .  She denied doing anything that was unsafe or [intended] to cause harm.  I later brought Darwin Belvill into my office to see if he had been aware of any issues between Lowell and Diana and to specifically inquire about the [forklift] incident.  Darwin . . . recalled the incident and stated that Lowell "may have been to the side or behind the bin" when Diana came to pick up the shrinkage bin.  When asked if he deemed any of Diana's actions . . . unsafe, he responded by stating "I cannot say if it was unsafe."

Doc. 40-4 at 2.  Mr. Herwig testified that Mr. Belvill also told him that it was "gutsy for [Ms. Swaim] to come in" with the forklift and one was "asking for a fight if you do that."  Doc. 40 at 8.

Mr. Herwig did not report the incident to defendant's safety manager after completing his Memo to File.  He testified that if he had "felt that [the incident] was truly a health and safety issue[,] it would have [gone] straight to [defendant's] health and safety manager to investigate."  Doc. 40 at 7.  Defendant took no disciplinary action against plaintiff or Ms. Swaim because of the incident.

### 4.  Forklift Incident No. 2

Near the end of his shift on May 18, 2013, plaintiff again damaged defendant's facility with a forklift.  Plaintiff testified that he was alone and using a forklift to load materials into a

gantry cage near Line 7.[3]  When he raised the forks of his lift to place the materials on a high shelf, the top of the lift hit the gantry's rail.  The impact was substantial enough that it bent the rail and caused the gantry's sliding doors to catch.  Plaintiff knew that he had damaged the gantry but did not report the incident immediately.  Again, he planned to fix the damage himself—a violation of defendant's incident reporting policy.

Plaintiff did not report or fix the damaged gantry before attending a safety meeting, three weeks later, on June 6, 2013.  During that meeting, defendant's safety manager reminded employees that failing to report an incident under the incident reporting policy could result in disciplinary action or termination.  Immediately after the meeting, plaintiff reported his May 18 forklift incident.

### D.  Plaintiff's Termination

Defendant terminated plaintiff's employment nine days later on June 15, 2013. Defendant articulated plaintiff's failing to report his 2011 and 2013 forklift incidents, as required by defendant's incident reporting policy, as the reason for terminating his employment.  Mr. Mendicina and Mr. Knoth made the decision to terminate plaintiff after Mr. Herwig recommended that they do so.  Both Mr. Mendicina and Mr. Knoth testified that they were unaware of the shrinkage bin incident involving plaintiff and Ms. Swaim when they terminated plaintiff's employment.

Plaintiff disputes defendant's reason for his termination.  He contends that defendant terminated him because of his race and because it wanted to retaliate against him for reporting the shrinkage bin incident.  During his deposition, plaintiff testified that he does not have personal knowledge about:  (1) how defendant's termination decision-making process works; (2)

---

[3]      The gantry cage stores boxes of completed lightbulbs before defendant ships them to its customers.

how defendant made the decision to terminate his employment; or (3) whether defendant fabricated records about his termination.  Plaintiff also testified that he did not complain about racial discrimination or receive comments about his race while working for defendant.

In 2014, plaintiff testified at a deposition in another lawsuit.  There, he testified that he believed defendant terminated his employment because a "[c]o-worker that I did not get along with, didn't get any support . . . and help with[,] and I believe that [it] was easier to get rid of me than to deal with the problems that I've reported to them."  Doc. 37-9 at 2.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute [about] any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When applying this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)).  A disputed "issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And an "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the

moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248-49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)). To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

Defendant moves for summary judgment against both plaintiff's § 1981 claim and his claim for retaliatory discharge. The Court analyzes both of these claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Perry v.*

*Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999) ("While *McDonnell Douglas* involved a Title

VII claim for failure to hire, the analytical framework it pioneered applies equally to claims

brought pursuant to section 1981."); *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 219 P.3d

857, 862 (Kan. Ct. App. 2009) (applying *McDonnell Douglas* framework to retaliatory discharge

claim brought under common law exception to Kansas employment-at-will doctrine).  And while

plaintiff has not adduced any direct evidence of discrimination, he may rely on circumstantial

evidence to prove discrimination or retaliation within the *McDonnell Douglas* analysis.  *See*

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000) ("The Supreme

Court set forth the framework for assessing circumstantial evidence of discrimination in

*McDonnell Douglas* . . . .").

The *McDonnell Douglas* framework uses a three-step analysis.  First, plaintiff must

establish a prima facie case.  *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995) (citing

*McDonnell Douglas*, 411 U.S. at 802).  If the plaintiff meets the burden of establishing a prima

facie case, the burden then shifts to the defendant to provide a legitimate, non-discriminatory

reason for its adverse employment decision.  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802-

03).  "At the summary judgment stage, it then becomes the plaintiff's burden to show that there

is a genuine dispute of material fact whether the employer's proffered reason for the challenged

action is pretextual—*i.e.* unworthy of belief."  *Id.* (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616,

622 (10th Cir. 1994)).

Defendant argues that plaintiff's claims cannot survive the *McDonnell Douglas* analysis

for two independent reasons.  First, defendant contends that plaintiff cannot establish a prima

facie case to support either claim, and, therefore, they fail as a threshold matter.  Second, even if

plaintiff could establish a prima facie case:  (a) defendant asserts it has articulated a legitimate,

non-discriminatory reason for his termination; and (b) plaintiff has adduced no evidence from which a reasonable jury could find that defendant's reason is pretextual.  The Court addresses each of defendant's arguments, in turn, below.

### A.  Plaintiff's Prima Facie Case

The *McDonnell Douglas* framework places the initial burden of proof on plaintiff.  To satisfy his burden here, plaintiff must present a prima facie case of discrimination and retaliation. The elements required to present a prima facie case are flexible and "may differ according to differing fact situations."  *Mohammed v. Callaway*, 698 F.2d 395, 398 (10th Cir. 1983) (citing *McDonnell Douglas*, 411 U.S. at 802 n.13).  The burden at the prima facie stage is "not [an] onerous" one.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Plaintiff only must present facts to support an inference of discrimination, *Mohammed*, 698 F.2d at 398, and need "'not dispel the non-discriminatory reasons subsequently proffered by the defendant.'"  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000)).  Here, defendant contends that it deserves summary judgment because plaintiff cannot establish a prima facie case of racial discrimination or retaliatory discharge.  The next two subsections analyze defendant's arguments under each one of plaintiff's two independent legal theories.

### 1.  Racial Discrimination Under 42 U.S.C. § 1981

Plaintiff contends that defendant terminated his employment because of his race.  To establish a prima facie case of racial discrimination under 42 U.S.C. § 1981, a plaintiff must show that:  "(1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination."  *Robinson v. City of Arkansas City, Kan.*, 896 F. Supp. 2d 1020, 1034 (D.

Kan. 2012) (citing *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007)).  Defendant does not dispute that plaintiff can satisfy the first two prongs of the prima facie test.  But defendant argues that plaintiff cannot satisfy the third prong because his termination did not occur under circumstances giving rise to an inference of discrimination.

A number of circumstances can support a sufficient basis for an inference of discrimination under this third prong, including "'actions or remarks made by decision makers that could be viewed as reflecting a discriminatory animus . . . , preferential treatment given to employees outside the protected class . . . or, more generally, upon the timing or sequence of events leading to plaintiff's termination.'"  *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  Here, plaintiff argues that his termination supports an inference of discrimination for two reasons.  First, he contends that defendant gave preferential treatment to Caucasian employees when administering discipline under the PDA plan.  Second, plaintiff contends that defendant's failure to follow its internal policies after he reported the shrinkage bin incident demonstrates its preference for Caucasian employees and its discriminatory animus towards him as an African-American employee.

As for plaintiff's first contention—that defendant extended preferential treatment to Caucasian employees under its PDA plan—plaintiff relies on two examples.  First, plaintiff points to the disciplinary actions taken by defendant after his April 8, 2013 confrontation with Mr. Sonneberger.  He argues that defendant displayed a preference for Caucasian employees when it gave him a Written Warning II but gave Mr. Sonneberger no written disciplinary warning.  Second, plaintiff argues that over a six-year period, he was the only employee who defendant fired for causing damage to its facility.  He notes that Ms. Swaim testified that

defendant did not discharge Steve Pound, a Caucasian employee, who damaged property at the facility.

At the outset, the Court concludes that plaintiff's confrontation with Mr. Sonneberger is sufficient to raise at least an inference that defendant gave preferential treatment to a Caucasian employee. Plaintiff has come forward with evidence demonstrating that defendant imposed a harsher level of discipline against him than it did against Mr. Sonneberger. While plaintiff fails to present evidence showing that his heightened discipline resulted from either man's race, the mere difference in treatment between the two arguably is sufficient to establish a prima facie case. *See Orr*, 417 F.3d at 1153 (citing *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1195 n.7 (holding that evidence that plaintiff was "treated differently than other [similarly situated employees], left unexplained, is sufficient to raise an inference of illegal discrimination at the prima facie stage")). Thus, the Court finds that plaintiff has established a prima facie case of racial discrimination under 42 U.S.C. § 1981.

Because this circumstance suffices to establish a prima facie case, the Court need not address plaintiff's alternative arguments on this point. Indeed, once "a plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's'" termination. *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). So, the *McDonnell Douglas* framework shifts the burden of proof on plaintiff's § 1981 claim to defendant to present a legitimate, non-discriminatory reason for plaintiff's termination. The Court addresses defendant's proffered reason in subsection B, below.

## 2.   Retaliatory Discharge Under Kansas Common Law

Plaintiff claims that defendant unlawfully terminated his employment to retaliate against him for reporting the shrinkage bin incident.  Plaintiff contends that Ms. Swaim's actions were a "potential assault upon [his] person" and Kansas common law protected his right to report her unsafe conduct.

"Kansas follows the common-law employment-at-will doctrine, which allows employers to terminate employees for good cause, for no cause, or even for the wrong cause."  *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 821 (Kan. 2003).  Thus, to "prevail on a retaliatory discharge claim, an employee must demonstrate that he or she falls within one of the exceptions to the employment-at-will doctrine."  *Id*. (citing *Bracken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002)).  One of these exceptions is termination for whistleblowing.  *Id.*

The Kansas Supreme Court first recognized an actionable tort for discharge in retaliation for whistleblowing in *Palmer v. Brown*, 752 P.2d 685, 689-90 (Kan. 1988).  To maintain a retaliatory discharge action under *Palmer*, a plaintiff must prove each of the following elements: (1) "a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare;" (2) "the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee;" and (3) "the employee was discharged in retaliation for making the report."  *Id.* at 690.  In addition, the whistleblowing "must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy[,] or personal gain."  *Id*.  A plaintiff may rely on the *McDonnell Douglas* burden-shifting framework to prove his retaliatory discharge case.  *See Shaw*, 219 P.3d at 862.

No dispute exists about one aspect of this test:  Plaintiff reported the shrinkage bin incident to defendant before defendant terminated his employment.  Thus, plaintiff can satisfy the second element of a retaliation claim.  But defendant argues that plaintiff cannot satisfy the first or third elements of a prima facie case for retaliatory discharge, and the Court thus should grant summary judgment on plaintiff's retaliation claim.  The Court examines both elements, in turn, below.

### a.   Element No. 1:  Plaintiff's Report of a Co-Worker's Violation

To satisfy the first requirement of a retaliation case, plaintiff must show that a reasonably prudent person would conclude that Ms. Swaim engaged in conduct "in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare." *Id*.  The violation must be serious, *see id*. at 689-90, and the public policy at issue "must be 'so definite and fixed that its existence is not subject to any substantial doubt.'" *Goodman*, 78 P.3d at 823 (quoting *Palmer*, 752 P.2d at 687-88).  This is so because "*Palmer* simply was not meant to endow every workplace dispute over the water cooler on company practices . . . with whistle-blower overtones." *Fowler v. Criticare Home Health Servs., Inc.*, 10 P.3d 8, 15 (Kan. Ct. App. 2000).

Here, plaintiff alleges that Ms. Swaim used a forklift to pick up and move a shrinkage bin while he was cleaning it.  Plaintiff testified that he was wiping the backside of the bin when Ms. Swaim picked it up, looked at him, and drove away.  He was not injured or touched during the incident.  Still, he contends that Ms. Swaim's actions "constituted a potential assault upon [his] person" and were "sufficiently egregious for a reasonably prudent person to conclude that [his] reporting qualifies as protected speech under *Palmer* and its progeny."  Doc. 40 at 17.  Despite his certainty on this point, plaintiff does not cite any specific passage of *Palmer* or any other

Kansas case as support for his claim that reporting a "potential assault" qualifies for whistleblower protection.

Kansas courts define the tort of assault as "an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm." *Baska v. Scherzer*, 156 P.3d 617, 621 (Kan. 2007) (quoting PIK Civ. 3d 127.01 (1997)). Because actual bodily contact is not required, plaintiff's allegation of a "potential assault," arguably, could amount to a claim for assault. And our Court recently decided that an employee's report of assault under the Kansas statute "could theoretically suffice for establishing whistleblower protection" under *Palmer. Cory v. City of Basehor*, No. 12-2547, 2014 WL 3396273, at *10 (D. Kan. July 11, 2014). But to satisfy the first element of a retaliatory discharge claim, plaintiff must show that a reasonably prudent person would have concluded that Ms. Swaim committed an assault. *Id.*

Darwin Belvill, plaintiff's co-worker, was the only witness to the incident. He testified that plaintiff was standing beside the shrinkage bin when Ms. Swaim picked it up with the forklift. From Mr. Belvill's view, it appeared as though Ms. Swaim could have seen plaintiff next to the bin before she approached. But Mr. Belvill could not opine whether Ms. Swaim's actions were unsafe. Because of the record's ambiguity about what actually occurred, the Court views the facts in the light most favorable to plaintiff and concludes that plaintiff has satisfied the first element of a retaliatory discharge claim. While this is a close call, the summary judgment standard requires the Court to give plaintiff the benefit on close calls. Viewed in this light, the summary judgment record contains facts that could permit a reasonable jury to conclude that Ms. Swaim's conduct amounted to assault under Kansas law.

#### b.   Element No. 3:  Evidence of a Retaliatory Motive

Next, the Court considers the third element of a retaliatory discharge claim.  This element requires plaintiff to come forward with evidence from which a reasonable jury could find that defendant terminated his employment as retaliation for his reporting the shrinkage bin incident. Plaintiff has failed to adduce such evidence here.  Aside from plaintiff's own speculation about defendant's motives, the summary judgment record contains no facts that can support a finding that plaintiff's April 26, 2013 report about the shrinkage bin incident caused his termination on June 15, 2013.

Defendant asserts that it discharged plaintiff because he failed to report two forklift incidents in a timely manner—the second of which occurred on May 18, 2013.  The disciplinary form used to document plaintiff's termination describes the events precipitating his discharge: "Lowell was driving his forklift and damaged the Line 7 gantry cage . . . .  Damage was done to Company property and Lowell failed to report the accident immediately by waiting until June 6, 2013 to report the accident."  Doc. 37-2 at 15.  The form's "Consequences" section states that defendant terminated plaintiff because his failure to report the incident was his "second instance of the same violation."  *Id.*

Plaintiff advances two arguments to support his claim that defendant actually terminated him as retaliation for reporting the shrinkage bin incident.  First, plaintiff argues that the four weeks between the conclusion of Mr. Herwig's investigation of the incident and his termination establish a causal connection between the two events.  Second, he contends that Mr. Herwig's failure to report the incident to the safety manager shows that he harbored a retaliatory motive toward plaintiff.

Plaintiff cannot draw the required causal connection between the conclusion of Mr. Herwig's investigation and his termination.  "When evaluating whether causation has been established, Kansas courts look to whether close temporal proximity existed between *the whistleblowing activity* and the discharge." *Boe v. AlliedSignal Inc.*, 131 F. Supp. 2d 1197, 1204 (D. Kan. 2001) (citing *Rebarchek v. Farmers Co-op Elevator & Mercantile Ass'n of Dighton*, 13 P.3d 17, 23 (Kan. Ct. App. 2000), *rev'd on other grounds*, 35 P.3d 892 (Kan. 2001)) (emphasis added).  Thus, while plaintiff claims that the clock measuring temporal proximity started to run when Mr. Herwig concluded his investigation, the Court must look to the date when defendant learned that plaintiff had reported the shrinkage bin incident to determine whether a factfinder reasonably could conclude that a causal connection exists.  Plaintiff informed Mr. Herwig about the shrinkage bin incident on April 26, 2013—nearly two months before his termination.  Generally, this two-month period is short enough for the factfinder to infer a retaliatory motive from it.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (assuming temporal proximity of two months and one week was sufficient to support a prima facie case of retaliation); *Hudson v. AIH Receivable Mgmt. Servs.*, No. 10-2287, 2012 WL 830515, at *12 (D. Kan. Mar. 9, 2012) (finding temporal proximity of three months sufficient to establish a prima facie case under Kansas law).

But "evidence of temporal proximity has minimal probative value in a retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action." *Twig v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-02 (10th Cir. 2011) (affirming summary judgment against retaliatory discharge claim when employee's unexcused "absences occurred *after* her complaint about discrimination and *before* [her employer] terminated her employment") (citing *Argo v.*

18

*Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006)); *see also*

*Rebarchek*, 35 P.3d at 899 (applying Tenth Circuit standard for determining causal connection

between protected activity and employee's termination in Kansas retaliatory discharge case).

      Here, no dispute exists.  Plaintiff failed to report "immediately" the damage that he

caused with a forklift on May 18, 2013.  This failure violated defendant's incident reporting

policy, which provided, in relevant part, that "[a]ll power vehicle incidents must be reported

immediately to a supervisor regardless of severity."  Doc. 37-2 at 8.  Defendant's policy required

that such incidents be "reported immediately."  *Id.*  Plaintiff had received a written warning for

violating this policy in October 2013.  Thus, plaintiff's second failure to report damage he had

caused with his power vehicle represented a legitimate basis for his termination under his

employer's written employment policies.  And, because this policy violation occurred between

plaintiff's report about the shrinkage bin incident and his termination, it eliminates the causal

connection that a trier of fact otherwise could draw between these two events.  *See Twig*, 659

F.3d at 1001-02 ("Thus, [plaintiff's] unreported absences constitute intervening events that

undermine her temporal proximity argument."); *Rebarchek*, 35 P.3d at 899.  Thus, plaintiff has

failed to satisfy the first requirement of his prima facie case.

      Next, plaintiff tries to meet his obligation to show that defendant terminated his

employment for reporting the shrinkage bin incident by asserting that Mr. Herwig acted with a

retaliatory motive, "effectively hid" facts about the incident, and "chose to subvert" defendant's

reporting policies by not reporting the incident to the safety manager.  Doc. 40 at 19.  Plaintiff

asserts that Mr. Herwig's actions show that he rejected plaintiff's report of the incident "for

reasons that may only be construed as retaliatory."  Doc. 40 at 19.  But no evidence in the

summary judgment facts can support an inference that Mr. Herwig acted out of a desire to
retaliate against plaintiff.

Mr. Herwig began investigating the incident soon after he received plaintiff's report.  Mr.
Herwig determined that the incident was not a health and safety matter and, as a result, he did not
report it to the safety manager.  He instead drafted a "Memo to File" on May 15, 2013.
Defendant took no disciplinary action against either plaintiff or Ms. Swaim because of the
incident.  And, on June 26, 2013, defendant terminated plaintiff's employment after he again had
violated his employer's written policy by failing to report—immediately—a forklift incident.
Except for plaintiff's own speculation, plaintiff has adduced no evidence from which a rational
jury could conclude that defendant terminated him for reporting the shrinkage bin incident.  And,
as already discussed, above, plaintiff's speculation or conclusory allegations will not support this
requirement of a retaliation claim.  *See Bones*, 366 F.3d at 875; *Beams*, 256 F. Supp. 2d at 1217;
*Brinkman*, 863 F. Supp. at 1487.  Thus, the Court concludes that plaintiff has not discharged the
burden imposed by this third element of a prima facie case for retaliatory discharge.  The Court
thus grants summary judgment against this claim.[4]

### B.  Defendant's Legitimate, Non-Discriminatory Reason for Plaintiff's Termination

Because plaintiff has established a prima facie case of racial discrimination under 42
U.S.C. § 1981, the burden of proof under *McDonnell Douglas* shifts to defendant to provide a
legitimate, non-discriminatory reason for plaintiff's termination.  *Khalik v. United Air Lines*, 671
F.3d 1188, 1193 (10th Cir. 2012) (citation omitted).  Defendant has met this burden by
articulating a legitimate, non-discriminatory reason for terminating plaintiff's employment, *i.e.*,

---

[4]         Even if plaintiff could satisfy the prima facie elements of a retaliatory discharge claim under
Kansas law, the Court would still grant summary judgment in defendant's favor.  Plaintiff asserts the
same arguments in support of pretext for each of his two claims, but he has failed to carry his burden to
raise a genuine factual issue whether defendant's proffered reason is unworthy of belief.

plaintiff failed to report two forklift incidents causing damage to its facility.  The second such incident occurred while plaintiff was on a Written Warning II.  This amounts to a legitimate, non-discriminatory reason for plaintiff's termination and shifts the burden back to plaintiff to demonstrate that defendant's proffered reason is pretextual.

### C.  Pretext

A plaintiff can demonstrate pretext by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citations and internal quotation marks omitted).  But "'mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'" *Id.* (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).  Plaintiff advances seven "factual matters" that, he contends, demonstrate that defendant's proffered reason is pretextual.  The Court addresses each of plaintiff's arguments in the following paragraphs.[5]

First, plaintiff points to defendant's actions following his confrontation with Mr. Sonneberger in April 2013.  Plaintiff contends that Mr. Herwig's decision to issue a written disciplinary warning to plaintiff and not to Mr. Sonneberger could lead a reasonable jury to conclude that defendant's articulated reason for plaintiff's termination is a pretextual one.  But this argument fails to raise a genuine issue of material fact.  While it is true that defendant imposed different levels of discipline against plaintiff and Mr. Sonneberger, the summary judgment facts include no evidence that this occurred because of plaintiff's race or Mr.

---

[5]     Because they arise from the same facts, the Court will address plaintiff's third and seventh arguments together.  The Court combines plaintiff's fifth and sixth arguments for the same reason.

Sonneberger's race.  Indeed, the record indicates that witnesses reported plaintiff's behavior during the argument as loud, threatening, "very disturbing[,] and scary."  Doc. 37-2 at 13.  Based on these reports, plaintiff received a Written Warning II—an advancement of one step in the PDA process.[6]  But nothing in the summary judgment record suggests that Mr. Sonneberger acted in the same manner as plaintiff had acted.  Nor do the summary judgment facts contain any evidence of Mr. Sonneberger's disciplinary record before plaintiff's confrontation with him.  A reasonable trier of fact, therefore, cannot compare defendant's discipline of plaintiff to that received by Mr. Sonneberger.  Without more, a reasonable jury could not properly infer a discriminatory motive from defendant's handling of this dispute.  *See Morgan*, 108 F.3d at 1323.  Plaintiff's first argument thus fails to raise an inference of pretext.

Second, plaintiff argues that defendant's proffered reason is a pretext for discrimination because his direct supervisor, Mr. Jester, did not know about his termination until after it had occurred.  Plaintiff never identifies even one fact that could lead a reasonable jury to conclude that this fact supports a finding of pretext.  The summary judgment record contains no evidence about Mr. Jester's typical role in employee terminations permitting a comparison with his involvement in plaintiff's termination.  As defendant notes, the record indicates that Mr. Jester served dual roles with the company when defendant discharged plaintiff.  Doc. 40-1 at 12-13.  Because Mr. Jester focused primarily on technical matters, Bob Knoth often handled matters involving Mr. Jester's employees.  Doc. 40-3 at 66.  Plaintiff's second argument thus fails to provide any support for plaintiff's pretext argument.

---

[6]     Defendant placed plaintiff on the equivalent of a Written Warning II on October 23, 2011.  Under the PDA Plan, one step of the PDA process is removed for each year that the employee goes without a disciplinary incident.  When the April 8, 2013 confrontation with Mr. Sonneberger occurred, plaintiff had been incident-free for nearly one and one-half years.  Thus, he was at the Written Warning I step of defendant's PDA process.

Third, plaintiff contends that Mr. Herwig's failure to report the shrinkage bin incident involving Ms. Swaim, a Caucasian co-worker, to defendant's plant safety manager raises an inference of pretext.  He contends that Mr. Herwig "effectively hid . . . the issues surrounding" this incident.  Doc. 40 at 16.  According to plaintiff, defendant's internal policies require an employee's supervisor to forward all reports of near-miss incidents to the safety manager.  Here, plaintiff reported the incident to the Human Resources Manager, Mr. Herwig.  Mr. Herwig investigated the incident, and, ultimately, concluded that it did not present a health and safety issue.  He thus decided not to forward plaintiff's report to the safety manager or take any disciplinary action against Ms. Swaim.  But Mr. Herwig informed plaintiff's direct supervisor, Mr. Jester, about the incident.  He also documented the results of his investigation in a "Memo to File" on May 15, 2013.  Plaintiff has adduced no evidence in the summary judgment record that could support an inference that Mr. Herwig's actions were motivated by race.  Nor has plaintiff adduced any evidence or legal argument that provides a basis for connecting Mr. Herwig's purported failure to report the shrinkage bin incident to a safety manager to plaintiff's termination.  Instead, plaintiff argues that Mr. Herwig's actions, alone, are evidence of pretext. This argument is nothing more than conjecture and is not enough to survive summary judgment. *See Morgan*, 108 F.3d at 1323.

Fourth, plaintiff asserts that defendant failed to implement a Process Improvement Plan or retrain him after he failed to report his first forklift incident in 2011 or his confrontation with Greg Sonneberger in 2013.  But this assertion ignores undisputed testimony by Bob Knoth.  Mr. Knoth testified that defendant used Process Improvement Plans and retraining only as a means to increase its employees' technical knowledge.  No facts suggest defendant ever used Process Improvement Plans to address violations of the incident reporting policy or employee conduct

issues generally.  Doc. 40-2 at 26-27.  Without record evidence suggesting otherwise, plaintiff's

fourth argument presents no facts that could support an inference of pretext.

Finally, plaintiff argues that defendant's proffered reason is pretextual because its

policies did not require defendant to terminate plaintiff for failing to report his second forklift

incident.  Plaintiff also argues that defendant improperly skipped disciplinary steps in its PDA

plan when it issued him a Written Warning II after his confrontation with Mr. Sonneberger and

when it terminated him.  This argument raises no genuine issue of fact material to the issue

whether defendant's proffered reason is worthy of belief.  Plaintiff is correct that defendant's

policies did not *require* it to terminate plaintiff.  But, defendant's incident reporting policy

expressly permitted termination of an employee who violated it, *i.e.*: "All powered vehicle

incidents must be reported immediately to a supervisor regardless of severity . . . *Failure to*

*report such incidents may result in immediate termination per Salina Plant Rules*."  Doc. 37-2 at

8 (emphasis added).  Thus, defendant's decision to terminate plaintiff for failing to report a

second forklift incident in a timely manner complied with defendant's explicit incident reporting

policy.

Also contrary to plaintiff's contention, the PDA plan did not require defendant to advance

an employee sequentially through all four disciplinary steps.  The plan, in relevant part, states:

> Philips reserves the right to administer appropriate disciplinary action for all
> forms of disruptive and/or inappropriate behavior.  Each situation will be dealt
> with on an individual basis, based on the facts and circumstances surrounding the
> infraction.  Depending upon the seriousness of the infraction, *not all discipline*
> *will follow the steps of the PDA plan*.

Doc. 37-2 at 7 (emphasis added).  Plaintiff received a Written Warning II after his confrontation

with Mr. Sonneberger in April 2013.  As detailed above, this amounted to an advancement of

just one disciplinary step because plaintiff already was on the equivalent of a Written Warning I

in 2013.  So, plaintiff's assertion that defendant skipped a step in the PDA plan following the confrontation is wrong.  And in any event, the PDA plan authorized defendant to skip disciplinary steps or terminate employees at its discretion.  Defendant's termination of plaintiff complied with the PDA plan and the incident reporting policy, and plaintiff's fifth argument fails to raise a genuine issue whether defendant's proffered reason is pretextual.

Plaintiff has failed to adduce evidence from which a reasonable jury could determine that defendant's legitimate, non-discriminatory reason for his termination is a pretextual one.  The Court thus grants summary judgment against plaintiff's § 1981 racial discrimination claim.

**IV.    Conclusion**

No genuine issues of material fact exist and the summary judgment facts, when viewed in the light most favorable to plaintiff, entitle defendant to judgment as a matter of law against both of plaintiff's remaining claims.  The Court thus grants summary judgment for defendant on each of those two claims as well as on his abandoned claim for breach of an implied contract of employment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 36) is granted.

**IT IS SO ORDERED.**

**Dated this 3rd day of September, 2015, at Topeka, Kansas.**


**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**

25